UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| RICK GRESS,<br><br>                      Plaintiff,<br><br>   v.<br><br>CONOVER INSURANCE, INC., a<br>Washington corporation,<br><br>                  Defendant. | NO:  CV-10-3056-RMP<br><br>ORDER GRANTING SUMMARY<br>JUDGMENT |

This matter comes before the Court on Defendant Conover Insurance, Inc.'s ("Conover") motion for summary judgment, ECF No. 16, against Plaintiff Rick Gress, a former employee of Conover.  The Court heard oral argument on these issues on August 8, 2011, has reviewed the parties' submissions filed in relation to the motion and the remainder of the file in this case, and is now fully informed.

/ / /

/ / /

ORDER GRANTING SUMMARY JUDGMENT ~ 1

1

BACKGROUND

2

***Procedural Posture***

3

Mr. Gress sued Conover Insurance, Inc. ("Conover") in Yakima County

4

Superior Court for: (1) a declaratory judgment that noncompetition and

5

confidentiality provisions of a 2009 employment agreement between Gress and

6

Conover are not enforceable; (2) damages for wrongful termination in violation of

7

public policy as stated by the Washington Law Against Discrimination ("WLAD"),

8

RCW Ch. 49.60, and/or the Americans with Disability Act ("ADA") and the

9

Washington State Family Care Act ("FLA") Family Medical Leave Act

10

("FMLA"); and (3) reasonable attorney's fees and costs.  ECF No. 1-2.  Conover

11

removed the matter to federal Court.  ECF No. 1.

12

***Undisputed Facts***

13

Mr. Gress worked as an agent for Conover, an insurance agency in Yakima,

14

Washington, from October 2001 through June 2010.  Mr. Gress sold crop

15

insurance to farmers in south central Washington.  Mr. Gress received positive

16

feedback from his clients for his professionalism and good service, as evidenced by

17

the declarations of the present and former Conover clients who worked with Mr.

18

Gress as their agent.[1]  ECF No. 39, Attachments 1-13.  Moreover, Conover

19

[1] However, the Court notes that even among the positive statements submitted by

20

Mr. Gress, there is evidence of some client discontent, such as the statement,

ORDER GRANTING SUMMARY JUDGMENT ~ 2

management recognized that he was responsible for a significant amount of new business by giving him the "Shooting Star" award for generating "2009 Growth Exceeding $82,000." ECF Nos. 49-1, 49-2, 49-3, and 40-1 at 1-2.

Mr. Gress executed an employment agreement in 2001 ("2001 employment agreement") when he was hired by Conover. ECF No. 19-6. He executed a second employment agreement on February 19, 2009 ("2009 employment agreement"), which was accompanied by two attached schedules that Mr. Gress also signed, "Schedule A" and "Schedule B." ECF Nos. 19-7, 19-8, and 19-9. Both the 2001 and 2009 employment agreements contain agreements not to compete. ECF Nos. 19-6, 19-7.

As an insurance agent, Mr. Gress frequently worked in the field, away from the office. As a result of being away from the office, Mr. Gress cooperated with customer service agents ("CSAs") working in the office to enter the data into Conover's system to enroll newly insured growers and to manage existing accounts. Mr. Gress worked with one CSA, Rita Fryer, until 2008 when he began to work with both Ms. Fryer and Jill Rawlings. Dep. of Gress, Vol. I, ECF No. 19-4 at 8-9.

---

"There were times when I felt Rick could have given me better service; however, if Rick was not available, his staff was." ECF No. 39-12 at 3.

ORDER GRANTING SUMMARY JUDGMENT ~ 3

Mr. Gress coached and managed American Legion baseball in summer 2009 with the permission of Conover management. Dep. of Rick Gress, Vol. I, ECF No. 19-4 at 21, 25. Mr. Gress recalls that he orally informed management at that time that his coaching commitment would last two or more years. Dep. of Gress, Vol. I, ECF No. 19-4 at 26-27. Mr. Gress further recalls that he promised the American Legion team that he would coach for both the 2009 and 2010 seasons. Dep. of Gress, Vol. II, ECF No. 19-13 at 10-11. Conover denies that there was any agreement in 2009, either oral or written, that Mr. Gress would be permitted by Conover to coach for two years or that Mr. Gress even discussed with his supervisors, in 2009, his intention to coach for two years. *See* Dep. of Kerri Record, ECF No. 19-10 at 10-11.

During summer 2009, the team that Mr. Gress coached played an average of six games per week, with many, if not all, scheduled as two games on the same date. Dep. of Gress, Vol. I, ECF No. 19-4 at 21-22. The team played away games at night and home games during the day. Dep. of Gress, Vol. I, ECF No. 19-4 at 21-22. Mr. Gress recalls that he spent four to five hours per week coaching and managing during the season, which consisted of June and July continuing into early August if the team made the playoffs. Dep. of Gress, Vol. I, ECF No. 19-4 at

ORDER GRANTING SUMMARY JUDGMENT ~ 4

21-22.[2]  Beginning in April or May, he also spent one to two hours per week recruiting players for the team.  Dep. of Gress, Vol. I, ECF No. 19-4 at 24.  Ms. Fryer, Mr. Gress's support staff, complained to Mr. Gress's supervisor that Mr. Gress was not as available as she needed him to be during summer 2009.  Dep. of Kerri Record, ECF No. 19-10 at 7.

On December 5, 2009, Mr. Gress broke both of his wrists in an accident that occurred outside of work.  ECF Nos. 19-4 at 13; 41-1 at 2.  A Conover employee informed Jenny Gress, Mr. Gress's wife, of Mr. Gress's option to take short-term disability pursuant to a supplemental insurance policy that Mr. Gress had purchased.  ECF No. 41-1 at 3.  Ms. Gress also was provided with the short-term disability paperwork if Mr. Gress decided to pursue it.  ECF No. 41-1 at 3.  Ms. Gress perceived that Conover employees were pressuring Mr. Gress, through their communications with her, to take short term disability.  ECF No. 41-1 at 4-5.  Mr. Gress did not take short-term disability.  Dep. of Gress, Vol. I, ECF No. 19-4 at 35-36.

---

[2] This recollection appears inconsistent with playing an average of six games, but the Court accepts it as true in the context of viewing the facts in the light most favorable to Mr. Gress, who is the non-moving party in this summary judgment motion.

ORDER GRANTING SUMMARY JUDGMENT ~ 5

It is unclear how much time Mr. Gress took off from work immediately following the accident, but the parties agree that he began to work again shortly after he was injured.  During the approximately two months that Mr. Gress had casts on his wrists, he could not write or drive.  Therefore, with the permission of Conover management, Ms. Gress drove him to his work appointments, and a customer service agent (CSA) accompanied them.  ECF No. 19-4 at 15-16.  CSAs at Conover normally work from the office and enter data into Conover's computer system, so providing a CSA to accompany Mr. Gress in the field to complete paperwork for him was a departure from standard work responsibilities.  ECF No. 19-4 at 14-15.

At the end of March 2010, Mr. Gress had his casts removed and underwent surgery associated with the cast removal.  Mr. Gress was "laid up" for approximately one week following the surgery, although it is unclear from the record whether he continued to work for Conover during that week or was on leave.  *See* Dep. of Gress, Vol. I, ECF No. 19-4 at 18-19.   At his deposition, Mr. Gress stated that he did not recall requesting any accommodation from Conover that Conover denied, either before or after his casts were removed.  ECF No. 19-14 at 16-18.

During the early part of 2010, Conover supervisors conducted annual reviews with agents about their performance and corresponding compensation for

ORDER GRANTING SUMMARY JUDGMENT ~ 6

1   the previous year, 2009, and about goals for 2010.  ECF Nos. 19-10; 39-16.  Mr.

2   Gress and his supervisor at Conover, Kerrie Record, and Conover's chief operating

3   officer, Connie Morrow, disagreed about the amount that Mr. Gress was owed for

4   his bonus.  ECF No. 39-16.  Ms. Record and Ms. Morrow thought that it was

5   appropriate to deduct as a "bad debt" the amount of a claim made against Conover

6   by an insured contesting a claim that Conover previously had denied.  Dep. of

7   Record, ECF No. 39-16 at 5-6.  According to Ms. Record, Conover could not seek

8   coverage for the loss from its errors and omissions insurance carrier because Mr.

9   Gress had admitted to the client that the denial in coverage had been Conover's

10  fault, which nullified any defenses Conover could raise with the insurance carrier.

11  Dep. of Record, ECF No. 39-16 at 5-6.  In addition, during the annual review

12  process, two other Conover insurance agents complained to Ms. Record about Mr.

13  Gress's unavailability during baseball season.  ECF No. 19-10 at 9.

14      On March 29, 2010, Ms. Record wrote Mr. Gress an email expressing

15  concern about a "rumor" she had heard that Mr. Gress intended to coach American

16  Legion baseball again for the summer 2010 season.  Mr. Gress met with Ms.

17  Record and Ms. Morrow on April 5, 2010, to discuss the coaching issue as well as

18  other matters.  Mr. Gress recalls that Ms. Record and Ms. Morrow asked him

19  whether he already had a contract to coach baseball in summer 2010, and he told

20  them that he did not but that Conover already had approved his coaching in 2009.

ORDER GRANTING SUMMARY JUDGMENT ~ 7

Dep. of Gress, Vol. I, ECF No. 19-4 at 29-30.  Ms. Record and Ms. Morrow

proceeded to tell Mr. Gress that they would not approve his coaching in 2010

because of his recent absence from work and the negative effect his coaching had

on his work in 2009.  Mr. Gress responded that he would not ruin his reputation,

and Conover's reputation, by cancelling his plans to coach so close to the

beginning of the season.  Dep. of Gress, Vol. I, ECF No. 19-4 at 30.  As Mr. Gress

recalls, "And [Ms. Record and Ms. Morrow] said if I was going to coach, that I

would be hearing from their attorney, with the possible grounds of termination."

Dep. of Gress, Vol. I, ECF No. 19-4 at 30.

Ms. Record and Ms. Morrow memorialized the conversation in an email

immediately following the meeting in April 2010:

> We told Rick that we would not approve for him to coach or manage
> the Pasco Sun Devils this season. Based on input from his team and
> the Ag producers he works with, he essentially took last summer off
> and we will not allow that to happen again this year. Rick was upset
> by this and is adamant that he continued to work the entire baseball
> season, that he is one of our top producers and he always puts
> numbers up for Conover. We told him that we felt with all of the time
> he has had off to recover from his accident, the time he may need to
> be with his daughter and the possibility of another surgery for him it's
> really unbelievable that he would consider taking more time away
> from work. Rick contends that he told me last year that this was a
> multiple year deal. I explained that I was not aware that is was a
> multi-year deal and had I known I never would have approved it. We
> let him know that coaching or managing the team is a violation of his
> employment agreement with Conover and we will not approve it. Rick
> went back to repeating that he has never stopped working, he is one of
> our top producers and baseball season does not affect his ability to do
> his job. He feels as though Conover is "coming down on him" and he

ORDER GRANTING SUMMARY JUDGMENT ~ 8

hasn't done anything to deserve it. Connie explained that Conover has been more than supportive of Rick through the years including these past several months as he has been recovering from his surgeries, we are not supportive of him coaching/managing baseball this year, he needs to do what he thinks is right and we will do what we think is right. [Added by Connie Morrow]-he was advised that coaching the team for a fee would be a violation of his employment agreement.

ECF No. 39-21 at 2.

Mr. Gress also received a bonus check during the April 5 meeting for the amount that Mr. Gress had claimed he was owed in February 2010 when Conover withheld the bonus amount as bad debt.  *See* ECF No. 40-2 at 4.  Although he received his full bonus, Ms. Record and Ms. Morrow informed Mr. Gress that the matter of Mr. Gress's informing the client that Conover would be responsible for paying the loss "even after [Mr. Gress] was told specifically not to do that" would be written up and added to his personnel file as a breach of the company's procedures.  ECF No. 39-21 at 2.

In late April 2010, Mr. Gress's daughter underwent brain surgery in Seattle. Mr. Gress was absent from work for approximately two weeks, between April 22 until May 10, 2010.  ECF No. 40-2 at 5-6.  Although he had discussed with Ms. Record the possibility of taking family medical leave following his daughter's surgery, Mr. Gress ultimately did not request or take any family medical leave. Dep. of Gress, Vol. 3, ECF No. 19-13 at 7.

ORDER GRANTING SUMMARY JUDGMENT ~ 9

In approximately May 2010, Mr. Gress signed a contract to manage and coach the American Legion baseball team for the 2010 season.  Dep. of Gress, Vol. 2, ECF No. 19-13 at 5.  Around the same time, the more experienced of the two CSAs with whom Mr. Gress worked, Ms. Fryer, began a period of maternity leave.  ECF Nos. 19-4 at 31.  Ms. Rawlings, the other CSA with whom Mr. Gress worked, expressed concerns to Ms. Record that Mr. Gress would be unavailable for work if he coached again in summer 2010.  Decl. of Jill Rawlings, ECF No. 20 at 2-3.  Ms. Rawlings previously had reported to Ms. Record, around January 2010, that she had difficulty reaching Mr. Gress when he was working with his wrist injury and when he coached during summer 2009.  Decl. of Jill Rawlings, ECF No. 20 at 2-3.  Ms. Rawlings also reported that she had received complaints from clients about Mr. Gress being unresponsive.  Decl. of Jill Rawlings, ECF No. 20 at 2-3.

Mr. Gress's decision to coach the baseball team in summer 2010 came to the attention of Conover when Ms. Morrow read a June 8, 2010, local newspaper article that referred to Mr. Gress as the team coach.  Dep. of Morrow, ECF No. 19-15; ECF No. 19-17 at 2.  Ms. Morrow brought the article to the attention of Conover's chief executive officer, Brad Green, and Conover management met with Mr. Gress on June 9, 2010.  At the meeting, Mr. Green, Ms. Morrow, and Ms. Record confronted Mr. Gress with the information contained in the newspaper article, and Mr. Gress responded that it was his intention to coach that summer.

ORDER GRANTING SUMMARY JUDGMENT ~ 10

Conover management informed Mr. Gress that they viewed his decision to coach again as insubordination.  Dep. of Bradley Green, ECF No. 19-19 at 14.  Mr. Gress left the meeting shortly after it began.  Dep. of Bradley Green, ECF No. 19-19 at 14.  At the conclusion of the meeting, Conover management placed Mr. Gress on suspension to allow further investigation of the matter.  Dep. of Bradley Green, ECF No. 19-19 at 14-17.

Conover terminated Mr. Gress on June 16, 2010. The termination letter stated, in part:

> On April 5 of this year, you had a meeting with Connie Morrow, the Company's Chief Operating Officer, and Kerri Record.  At that meeting you were advised that your continued involvement with the Sun Devils would not be authorized by the Company. They explained that your activities with the Sun Devils unduly interfered with your employment duties last season and they instructed you that failure to terminate your participation with the team would jeopardize your employment with the Company. They further advised you that your continued involvement with the team would violate Section 2 of your EE Agreement. You made it clear at that time that you did not intend to terminate your relationship with the Sun Devils.  It has now definitively come to our attention that you have not in fact resigned your position with the Sun Devils as directed, a failure which constitutes both a breach of your EE Agreement and an intolerable disregard of an express directive from management.

ECF No. 19-5 at 2.

## ANALYSIS

This Court exercises jurisdiction over this matter pursuant to 18 U.S.C. § 1331 (federal question) and the doctrine of pendent jurisdiction, 18 U.S.C. § 1367.

ORDER GRANTING SUMMARY JUDGMENT ~ 11

1    *Summary Judgment Standard*

2        Summary judgment is appropriate "if the movant shows that there is no

3    genuine dispute as to any material fact and the movant is entitled to judgment as a

4    matter of law." Fed.R.Civ.P. 56(a).  A key purpose of summary judgment "is to

5    isolate and dispose of factually unsupported claims . . . . " *Celotex Corp. v. Catrett*,

6    477 U.S. 317, 323-24 (1986).  Summary judgment is "not a disfavored procedural

7    shortcut," but is instead the "principal tool[ ] by which factually insufficient claims

8    or defenses [can] be isolated and prevented from going to trial with the attendant

9    unwarranted consumption of public and private resources." *Celotex*, 477 U.S. at

10   327.

11       The moving party bears the initial burden of demonstrating the absence of a

12   genuine issue of material fact.  *See Celotex*, 477 U.S. at 323. The moving party

13   must demonstrate to the Court that there is an absence of evidence to support the

14   non-moving party's case.  *See Celotex Corp.*, 477 U.S. at 325. The burden then

15   shifts to the non-moving party to "set out 'specific facts showing a genuine issue

16   for trial.'"  *Celotex Corp.*, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)).

17       A genuine issue of material fact exists if sufficient evidence supports the

18   claimed factual dispute, requiring "a jury or judge to resolve the parties' differing

19   versions of the truth at trial."  *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors*

20   *Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).  At summary judgment, the court draws

ORDER GRANTING SUMMARY JUDGMENT ~ 12

all reasonable inferences in favor of the nonmoving party.  If the nonmoving party

produces evidence that contradicts evidence produced by the moving party, the

court must assume the truth of the nonmoving party's evidence with respect to that

fact. *T.W. Elec. Service, Inc.*, 809 F.2d at 631.  The evidence presented by both the

moving and non-moving parties must be admissible. Fed.R.Civ.P. 56(e).

Furthermore, the court will not presume missing facts, and non-specific facts in

affidavits are not sufficient to support or undermine a claim.  *Lujan v. Nat'l*

*Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

### *Wrongful Termination in Violation of Public Policy*

In Washington, employment of indefinite duration generally may be

terminated by either the employer or the employee at any time, with or without

cause. *Bulman v. Safeway, Inc.*, 144 Wn.2d 335, 340 (2001).

One narrowly drawn exception to the general rule of at-will employment is

for wrongful discharge in violation of public policy.  *Danny v. Laidlaw Transit*

*Servs., Inc.*, 165 Wn.2d 200, 207 (2008).  A plaintiff pursuing a claim for damages

on the basis of wrongful discharge in violation of public policy in Washington

must prove the following elements:

> (1) the existence of a clear public policy (the clarity element); (2) that discouraging the employee's conduct would jeopardize the public policy (the jeopardy element); and (3) "that the public-policy-linked conduct caused the dismissal" (the causation element).

*Hubbard v. Spokane County*, 146 Wn.2d  699, 707 (Wash. 2002).

ORDER GRANTING SUMMARY JUDGMENT ~ 13

In addition, the employer must not have an overriding justification for the dismissal for the plaintiff to prevail. *Hubbard*, 146 Wn.2d at 707 (*quoting Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 941 (Wash.1996)). This public policy exception to the general rule of at-will employment has been recognized in four situations: "where the employee is fired (1) for refusing to commit an illegal act; (2) for performing a public duty or obligation; (3) for exercising a legal right or privilege; and (4) in retaliation for reporting employer misconduct." *Hubbard*, 146 Wn.2d at 707–08.

To avoid dismissal of a wrongful discharge at the summary judgment stage, the plaintiff employee must survive the burden shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973) and adopted in Washington in *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 180-82 (Wash. 2001), *overruled on other grounds by McClarty v. Totem Elec.*, 157 Wn.2d 214 (Wash. 2006). The plaintiff must first make a prima facie case of retaliatory discharge by showing that (1) he engaged in a statutorily protected activity, (2) the activity was followed by an adverse employment action, and (3) there is a causal link between the protected activity and the adverse action. *Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1065-66 (9th Cir. 2003).

In establishing a prima facie case, the employee need only establish that the employer's retaliatory motive was a substantial factor behind the termination.

ORDER GRANTING SUMMARY JUDGMENT ~ 14

*Renz v. Spokane Eye Clinic, P.S.*, 114 Wn. App. 611, 621 (Wash. App. Div. 3

2002).  A factor supporting the termination is substantial if "it so much as tips the

scales one way or the other."  *Renz*, 114 Wn. App. at 621.  Because employers

infrequently announce a retaliatory motive, employees ordinarily must resort to

circumstantial evidence to show it.  *Estevez v. Faculty Club of the Univ. of Wash.*,

129 Wn. App. 774, 799, (Wash. App. Div. 1 2005).

　　　　If the plaintiff establishes a prima facie case, "the evidentiary burden shifts

to the defendant to produce admissible evidence of a legitimate, nondiscriminatory

explanation for the adverse employment action sufficient to 'raise[ ] a genuine

issue of fact as to whether [the defendant] discriminated against the plaintiff.'"

*Hill*, 144 Wn.2d at 181 (*quoting Texas v. Dep't of Cmty. Affairs v. Burdine*, 450

U.S. 248, 254, (1981)); *Renz*, 114 Wn. App. at 622.

　　　　If the defendant employer meets that burden, the burden shifts back to the

employee to demonstrate that the employer's articulated rationale was not the true

reason for its action but rather a pretext for discrimination. *Hill*, 144 Wn.2d at 182,

23 P.3d 440; *Renz*, 114 Wn. App. at 622, 60 P.3d 106.  If the plaintiff cannot show

pretext, the defendant is entitled to judgment as a matter of law. *Hill*, 144 Wash.2d

at 182, 23 P.3d 440.

　　　　Summary judgment is appropriate even where the plaintiff establishes a

prima facie case but rebuts the defendant's proffer of a nondiscriminatory basis for

ORDER GRANTING SUMMARY JUDGMENT ~ 15

the termination with weak evidence of pretext or if the record contains abundant,

uncontroverted evidence of the nondiscriminatory reason for the employer's

decision. *Milligan*, 110 Wn. App. at 637. Conversely, if the parties meet all three

*McDonnell Douglas* intermediate burdens and the record contains reasonable but

competing inferences of both discrimination and nondiscrimination, a factfinder

must choose between such inferences and summary judgment is inappropriate.

*Hill*, 144 Wash.2d at 186, 23 P.3d 440.

Mr. Gress contends that he was fired for exercising a legal right to medical

leave, indicating that he would need to take family medical leave, and challenging

pay deductions that violated the compensation terms of his employment agreement

with Conover.

There is likely public policy in Washington under the FMLA and the WFLA

entitling all employees to take reasonable medical leave. *Fischer v. City of Roslyn*,

2011 WL 2639931, *7 (Wash. App. Div. 3 2011) (unpublished), and prohibiting

discrimination on the basis of disability, *Sedlacek v. Hillis*, 145 Wn.2d 379, 385,

(Wash. 2001).  However, regarding the third element required to make a prima

facie showing of retaliatory discharge, Mr. Gress puts forth only extremely

attenuated evidence of a causal link between his termination and his participation

in any activity that these public policies seek to promote. *See Stegall*, 350 F.3d at

1065-66.  Specifically, Mr. Gress emphasizes the following sentence of the email

ORDER GRANTING SUMMARY JUDGMENT ~ 16

1  by Ms. Record and Ms. Morrow regarding the April 5, 2010, meeting with Mr.

2  Gress: "We told him that we felt with all of the time he has had off to recover from

3  his accident, the time he may need to be with his daughter and the possibility of

4  another surgery for him it's really unbelievable that he would consider taking more

5  time away from work."  ECF No. 39-21 at 2.

6          The phrase quoted above indicates simply that Mr. Gress's need to take

7  substantial leave for other events in his life in 2009 and 2010 influenced his

8  supervisors' decision not to approve his coaching baseball in summer 2010.  There

9  is nothing to indicate that Conover management's decision to terminate Mr. Gress

10  in June 2010 was causally linked to his wrist injury in December 2009, for which

11  Mr. Gress received every minor accommodation he requested and argued himself

12  was not a disability, or the time that he took off for his daughter's surgery, for

13  which he did request any family medical leave.  ECF No. 40-2 at 4.  In addition,

14  Mr. Gress's pay dispute appears to have been resolved at the April 5, 2010,

15  meeting, more than two months before he was fired.  ECF No. 40-2 at 4.  The

16  clear, uncontroverted evidence in the record supports that Mr. Gress's own

17  subordination broke any chain of events between the disability, family medical

18  leave, and compensation-related activities and his termination.  Therefore, Mr.

19  Gress does not make a prima facie case of wrongful discharge in violation of

20  public policy.  *See Stegall*, 350 F.3d at 1065-66.

ORDER GRANTING SUMMARY JUDGMENT ~ 17

1    Even if the Court were to find that Mr. Gress established a prima facie case,

2    his wrongful discharge claim would fail as a matter of law on the basis of the

3    evidence that Conover put forth showing an overriding justification of his

4    termination, specifically Mr. Gress's insubordination in deciding to coach again in

5    the summer of 2010 despite his supervisors' direct orders not to do so, and his

6    work performance issues.  Mr. Gress fails to provide any evidence to support that

7    Conover's stated reasons for the termination are pretext.

8    Plaintiff argues that there are several factual disputes in the briefing and

9    accompanying declarations and exhibits before the Court that should foreclose a

10   summary judgment.  However, none of the disputes is material to the elements of a

11   retaliatory discharge claim or support that Conover's claim that Mr. Gress was

12   terminated for insubordination and related performance issues was pretextual.  *See*

13   *Hubbard*, 146 Wn.2d at 707.

14   First, the parties dispute whether Conover management knew of Mr. Gress's

15   intention to coach baseball for two years when they approved his 2009 coaching in

16   February 2009. When asked at his deposition why he signed the contract for the

17   summer 2010 coaching position when he knew that he could lose his job for

18   agreeing to coach in 2010, Mr. Gress stated, "For one, they approved it.  For two, I

19   didn't want to ruin my reputation in the community."  Dep. of Gress, Vol. II, ECF

20   No. 19-13 at 9.  Yet Mr. Gress presents no evidence apart from his own

ORDER GRANTING SUMMARY JUDGMENT ~ 18

1    recollection that Conover agreed that he could coach for 2009 and 2010.  Even if

2    Mr. Gress could supply additional evidence that Conover was aware that Mr. Gress

3    intended to coach for two years,  Conover's purported knowledge does not relate to

4    a protected activity under the state and federal statutory schemes referred to by Mr.

5    Gress's complaint.

6        The second alleged dispute concerns Mr. Gress's work performance.  Mr.

7    Gress contends that his work performance did not suffer as a result of his coaching

8    during summer 2009 and argues that he received an award for the amount of new

9    insurance that he wrote in 2009.  The Court agrees that the record contains

10   conflicting evidence regarding Mr. Gress's work performance.  Yet, the record

11   contains ample references to support  Conover's claim that management

12   terminated Mr. Gress based in part on the reports by Mr. Gress's colleagues that he

13   was unavailable or hard to reach during the 2009 coaching season.  Dep. of

14   Record, ECF No. 19-10 at 7; Decl. of Rawlings, ECF No. 20 at 2-3.

15       Mr. Gress argues that a third dispute stems from inconsistent statements by

16   Conover management regarding whether Mr. Gress would have continued to

17   receive his actual pay had he gone on short-term disability.  Mr. Gress argues that

18   these inconsistent statements go to the issue of whether Conover would have

19   benefitted had Mr. Gress elected to take short-term disability and FMLA leave for

20   his wrist injury.

ORDER GRANTING SUMMARY JUDGMENT ~ 19

Mr. Gress's argument is too speculative to support a material factual dispute that would avoid summary judgment.  The only evidence that Mr. Gress offers in support of the alleged dispute is Ms. Morrow's deposition testimony that a person who takes short-term leave also takes family medical leave, which is unpaid leave. Dep. of Morrow, ECF No. 39-14 at 4-5.  However, there is no evidence that Conover's management or employees pressured Mr. Gress to take short-term disability to avoid paying Mr. Gress his salary and/or wages.  As Ms. Morrow stated during her deposition, Conover may not have "saved [Mr. Gress's] pay" during any period of short-term disability leave because they may have had to hire someone to temporarily take over Mr. Gress's duties.  Dep. of Morrow, ECF No. 39-14 at 5.  Mr. Gress offers no evidence to support that Conover would have preferred to save Mr. Gress's salary during a period of leave and not have the benefit of his work.

In light of Mr. Gress's failure to establish a prima facie case and survive the *McDonnell Douglas* burden shifting framework, his wrongful discharge in violation of public policy claim is properly dismissed.  *Hill*, 144 Wn.2d at180-82.

### Enforceability of Noncompetition Clause

Mr. Gress argues the following regarding the enforceability of the noncompetition clause:

The fact that Conover unilaterally imposes new (and generally reduced) compensation schedules each year makes the three year term

ORDER GRANTING SUMMARY JUDGMENT ~ 20

of the noncompete provision unreasonable, and indeed fundamentally unfair. If employees receive only one year of compensation under the agreement, Conover should only get one year of protection from competition. Fair is fair. Both ways.

ECF No. 38 at 20.

Mr. Gress offers no authority for the proposition that the compensation terms and the noncompetition restrictions must be of equal duration.  Covenants not to compete upon termination of employment "are enforceable if they are reasonable."  *Knight, Vale and Gregory v. McDaniel*, 37 Wn. App. 366, 369 (Wash. App. Div. 2 1984) (citing *Sheppard v. Blackstock Lumber Co., Inc.*, 85 Wn.2d 929 (Wash. 1975).  The requisite considerations in determining whether a noncompetition covenant shall be enforced are: (1) whether restraint is necessary for the protection of the business or goodwill of the employer, (2) whether it imposes upon the employee any greater restraint than is reasonably necessary to secure the employer's business or goodwill, and (3) whether the degree of injury to the public is such loss of the service and skill of the employee as to warrant nonenforcement of the covenant.  *Racine v. Bender*, 141 Wash. 606 (1927).

Mr. Gress does not apply any of these considerations to his case, and the relationship between the length of the noncompetition covenant and the length of the compensation terms is not one of the requisite considerations.  A court determines the reasonableness of a covenant not to compete as a matter of law.

ORDER GRANTING SUMMARY JUDGMENT ~ 21

*Perry v. Moran*, 109 Wn.2d 691, 698-99 (Wash. 1987).  Therefore, upon finding that there is no basis to Mr. Gress's claim that the covenants not to compete are unenforceable, the Court dismisses Mr. Gress's claim for a declaratory judgment precluding enforcement of the covenant not to compete on summary judgment.

Accordingly, **IT IS SO ORDERED**:

1.  The Defendant's Motion for Summary Judgment, **ECF No. 16**, is **GRANTED**.

2.  This action is **DISMISSED WITH PREJUDICE** and without costs as to any party.

3.  All pending motions, if any, are **DENIED AS MOOT**.

4.  All pending deadlines and hearing dates, if any, are hereby **STRICKEN**.

The District Court Executive is directed to enter this Order, enter judgment against Plaintiff and in favor of Defendant, forward copies to counsel, and close the file.

**DATED** this 16th day of September, 2011.


_____*s/ Rosanna Malouf Peterson*_____
ROSANNA MALOUF PETERSON
Chief United States District Court Judge

ORDER GRANTING SUMMARY JUDGMENT ~ 22